Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, <br><br>     Plaintiffs, <br><br> vs. <br><br> KEITH LANNOM, Deputy Regional Forester, Region One of U.S. Forest Service, and U.S. FOREST SERVICE, <br><br>     Defendants. | CV-21- <br><br> COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

# I.  INTRODUCTION

1.      This is a civil action for judicial review under the Administrative Procedure Act of the U.S. Forest Service's (USFS) authorizations and/or lack thereof regarding the Horsefly Project (Project) and site-specific Forest Plan Amendment on the Lewis and Clark portion of the Helena-Lewis and Clark National Forest (Forest).

2.      Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies attest that the decisions approving the Project are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.      Defendants' approval of the Project and Plan and corresponding documents or lack thereof violate the National Environmental Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest  Management Act (NFMA), 16 U.S.C. §1600 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.      Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and/or such other relief as this Court deems just and proper.

## II. JURISDICTION

5.      This action arises under the laws of the United States and involves the

United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

6.    An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

7.    The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706.

8.    Plaintiffs fully participated in the available administrative review processes for the Project; thus they have exhausted administrative remedies. Thus, the Court has jurisdiction to review Plaintiffs' APA claims.

## III. VENUE

9.    Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule

3.2(b).  Defendant Lannom  resides in Missoula County, which is within the

Missoula Division of the United States District Court for the District of

Montana.

## IV. PARTIES

10.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt,

non-profit public interest organization dedicated to the protection and

preservation of the native biodiversity of the Northern Rockies Bioregion,

its native plant, fish, and animal life, and its naturally functioning

ecosystems. Its registered office is located in Missoula, Montana. The

Alliance has over 2,000 individual members, many of whom are located in

Montana. Members of the Alliance observe, enjoy, and appreciate

Montana's native wildlife, water quality, and terrestrial habitat quality, and

expect to continue to do so in the future, including in the Project area.

Alliance's members' professional and recreational activities are directly

affected by Defendants' failure to perform their lawful duty to protect and

conserve these ecosystems.  Alliance for the Wild Rockies brings this action

on its own behalf and on behalf of its adversely affected members.

11.    Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana

corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Helena-Lewis and Clark National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Helena-Lewis and Clark National Forest, including the Project area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

12. Defendant KEITH LANNOM is the Deputy Regional Forester for Region One/Northern Region of the U.S. Forest Service, and is the decision-maker who denied the administrative objections filed against the Project.

13. Defendant UNITED STATES FOREST SERVICE (USFS) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of National Forests, including the Helena-Lewis and Clark National Forest.

# V. FACTUAL ALLEGATIONS

**A.     Project and Project Area**

14.     The Horsefly Project (Project) is located in the Little Belt Mountains, approximately 12 miles north of White Sulphur Springs, Montana.

15.     The Project area is approximately 21,000 acres.

16.     The Project includes:

    a.     3,278 acres of commercial logging, which is referred to euphemistically as "intermediate treatment,"

    b.     1,049 acres acres of clearcutting, which is referred to euphemistically as "regeneration harvest,"

    c.     243 acres of modified clearcutting with whitebark pine as the leave trees, potentially including burning, which is referred to euphemistically as  "Five-Needle Pine Release,"

    d.     279 acres of modified clearcutting, which will remove trees around designated "leave trees," which is referred to euphemistically as "non-commercial stand improvement,"

    e.     1,117 acres of pre-commercial logging, which is referred to euphemistically as  "precommercial thinning,"

    f.     50 acres of commercial and non-commercial logging of all conifer trees in aspen groves, and potentially including post-logging burning,

referred to euphemistically as "aspen restoration,"

g.   409 acres of clearcutting and possible burning to create "meadows," referred to euphemistically as "meadow restoration,"

h.   465 acres of non-commercial tree cutting, referred to euphemistically as "rearrangement of fuels,"

i.   3,453 acres of prescribed burning, and

j.   43 acres of planting.

17.   The Project also includes 40.7 miles of new road construction, 16.8 miles of reconstruction, 32.2 miles of reconditioning, and 1.7 miles of relocating system roads.

18.   The Project Decision also states that road obliteration will be implemented on 24 miles of unauthorized "non-system" roads that were promised to be removed in the 2007 Travel Plan decision.   However, the Forest Service later clarified that these roads would be "decommissioned as funds become available."

19.   The Project includes a Forest Plan amendment to exempt the Project from two Forest Plan standards that protect elk hiding cover because the Project violates those standards.

20.   The Project may take 20 years to implement.

21.   The Project will result in a financial loss to the U.S. taxpayer of $256,000.

**B.    Procedural Background**

22.    Scoping for the Project started in March 2018.

23.    In January 2020, the Forest Service released a draft EA for the Project.

24.    In May 2020, the Forest Service released a final EA and draft Decision for the Project.

25.    On August 14, 2020, the Forest Service denied all administrative objections to the Project.

26.    Despite the denial of Plaintiffs' objection, on August 28, 2020, the Forest Service prepared a new analysis for elk habitat effectiveness for the project file but did not provide it to the public.

27.    On August 31, 2020, the final Decision was signed for the Project.

28.    The final Decision does not disclose the existence of the new August 28, 2020 analysis for elk habitat effectiveness.

29.    The Decision states that the Forest Plan amendments for this Project were completed under the 2012 NFMA planning regulations.

30.    The Forest Service completed its first Biological Assessment for the Project in May 2020.

31.    The Forest Service completed its second Biological Assessment for the Project in August 2020.

32.    On August 29, 2020, the U.S. Fish & Wildlife Service issued a letter of

concurrence for the Forest Service's Biological Assessment.

**C.      Elk hiding cover**

33.     Forest Plan Forest-wide Standard C-1 (5) requires that drainages or elk herd units containing identified summer/fall elk range be maintained at 30 percent or greater effective hiding cover.

34.     The Project will not comply with Forest Plan Forest-wide Standard C-1 (5).

35.     The Project will violate Forest Plan Forest-wide Standard C-1 (5) in six out of 16 individual watersheds.

36.     The Forest Service issued a Forest Plan amendment to exempt the Project from compliance with Forest Plan Forest-wide Standard C-1 (5) so that the Project can continue to remove elk hiding cover.

37.     Forest Plan Management Area C Standard for Wildlife requires maintenance of effective hiding cover percentages by timber compartment at an average of 40 percent with a minimum of 35 percent for any individual sub-compartment.

38.     The Project will not comply with the hiding cover requirement of Forest Plan Management Area C Standard for Wildlife.

39.     The Project will violate Management Area C Standard for Wildlife in all five of the individual timber compartments in the Project area.

40.     The Forest Service issued a Forest Plan amendment to exempt the Project

from compliance with the hiding cover requirement of Forest Plan Management Area C Standard for Wildlife so that the Project can continue to remove elk hiding cover.

41. The Project Decision states: "the purpose of the site-specific amendment is to allow hiding cover to drop below forest-wide standard C-1(5) and the effective hiding cover standard in management area C."

42. The rationale for hiding cover standards is set forth in the Montana Cooperative Elk/Logging Study, which is Forest Plan Appendix F.

43. Forest Plan Appendix F states: " Research findings, which have been compiled to date, through the Montana Cooperative Elk-Logging Study are the basis for several tentative management recommendations designed to minimize logging related impacts on elk. Appendix F summarizes research findings and recommendations which have application on the Lewis and Clark National Forest."

44. Appendix F states that "[r]oad density and cover quality are both important when considering adequate elk security during the hunting season."

45. Appendix F explains that research shows that where hiding cover is poor – "one-third or less of total area" – significant road density restrictions (to less than 0.5 miles/square mile) become necessary in order to "[r]educe harassment and emigration of elk" and "[r]educe the early elk harvest" and

"increase the uniformity of harvest throughout the season."

46. In other words, the Forest Plan standard that requires a minimum of 30% hiding cover for elk was intended to work in tandem with Forest Plan road density restrictions and is based upon the research summarized in Appendix F that open road densities over 0.5 miles/square mile combined with less than 30% hiding cover will start to cause elk to leave public lands and will negatively impact public elk hunting opportunities.

47. The Project Decision does not disclose the findings of Appendix F regarding the scientific rationale for the hiding cover retention standards.

48. The Project Decision does not address the interaction between creating or exacerbating poor cover in all five Project area timber compartments and the existing high road densities in those areas.

49. The Project Decision does not clearly identify what information was determined to be the best available scientific information, although it implies that "MDFWP and USDA Forest Service 2013, USDA Forest Service 2013" is the best available scientific information regarding elk hiding cover.

50. The Project Decision does not explain the basis for its apparent conclusion that "MDFWP and USDA Forest Service 2013, USDA Forest Service 2013" is the best available scientific information regarding elk hiding cover.

51. The Project Decision does not explain how "MDFWP and USDA Forest Service 2013, USDA Forest Service 2013" was applied to the elk hiding cover analysis, other than to represent that "[t]his scientific literature does not support a specific, quantifiable cover recommendation . . . ."

52. However, "USDA Forest Service 2013" states: "MDFWP and USFS (2013) did not recommend a quantifiable cover level for an EAU, citing that there is no scientific research that has looked at how much cover is needed for elk. Lyon et al. 1985 (Coordinating Elk and Timber Management; page 9) speaks to "good cover" as being two-thirds of the total area. The cover analysis and interpretation done at the project level should address existing Forest Plan standards."

53. Thus, "USDA Forest Service 2013" recommends that the Forest Service continue to comply with its existing Forest Plan hiding cover standards, and specifically references the Montana Elk/Logging Study, which is Forest Plan Appendix F.

**D.    Elk habitat effectiveness**

54. The Horsefly Project area includes three different mapped Forest Plan Management Areas: A, B, and C.

55. For Management Area C, the Forest Plan goal mandates: "Maintain or enhance existing elk habitat by maximizing habitat effectiveness as a

primary management objective."

56. For Management Area C, the Forest Plan standard mandates: " Habitat effectiveness will be positively managed through road management and other necessary controls on resource activities."

57. For Management Area C, the Forest Plan standard mandates: "Achieve low public access through permitting motorized use on all arterial and most collector roads. . . . Low access is defined as 0.5 to 1.5 miles of open road per square mile of area. . . . Elk habitat effectiveness will be maintained."

58. Forest Plan Forest-wide Standard C-1(2) mandates: "Utilize the general concepts presented in Agriculture Handbook No. 533, Wildlife Habitats in Managed Forests. . . . When more site specific management recommendations are available through the Forest Service or MDFW&P those recommendations will be followed." (Emphasis added).

59. The Project EA implies that "MDFWP and USDA Forest Service 2013," which is also commonly referred to as the "Eastside Assessment," is the best available scientific information regarding elk habitat.

60. The Eastside Assessment at page 17 states: "At the project level an elk habitat effectiveness analysis should be conducted."

61. The Eastside Assessment at page 17 states: "In those areas where there is a desire to improve and/or maintain elk habitat use, we recommend

maintaining or decreasing road densities that correspond with the desired habitat effectiveness level per Christensen et al. (1993)."

62. Christensen et al. (1993) states: "Any motorized vehicle use on roads will reduce habitat effectiveness. Recognize and deal with all forms of motorized vehicles and all uses, including administrative use."

63. Christensen et al. (1993) states: "For areas intended to benefit elk summer range and retain high use, habitat effectiveness should be 70 percent or greater."

64. Christensen et al. (1993) states: "For areas where elk are one of the primary resource considerations habitat effectiveness should be 50 percent or greater."

65. Christensen et al. (1993) states: "Areas where habitat effectiveness is retained at lower than 50 percent must be recognized as making only minor contributions to elk management goals. If habitat effectiveness is not important, don't fake it. Just admit up front that elk are not a consideration."

66. Christensen et al. (1993) states: "Reducing habitat effectiveness should never be considered as a means of controlling elk populations. A population over target is not a Forest Service habitat problem."

67. Accordingly, the Eastside Assessment states at page 17 states: "For areas

intended to benefit elk summer range and retain high elk use, habitat effectiveness related to motorized routes should be 70% or greater."

68.     Figure 1 in Christensen et al (1993) is set forth below:



5.  Levels of habitat effectiveness:

**Figure 1**—Habitat effectiveness for elk determined by road density (Lyon 1983).

69.     70% habitat effectiveness is approximately 0.7 miles of road per square mile.

70.     50% habitat effectiveness is approximately 1.7 miles of road per square mile.

71.     The Project EA does not disclose elk habitat effectiveness before, during, or

after Project implementation.

72.  The Project analysis on elk habitat effectiveness is found in the project file
     "big game report" and is calculated based on an assumption that the 2007
     Little Belts Travel Plan has been fully implemented.

73.  However, the Little Belts Travel Plan has not been fully implemented.

74.  Instead, the most recent biological assessment for the Travel Plan (dated
     January 27, 2021) discloses that there are hundreds of miles of roads that
     were designated as closed seasonally or year-round to public motorized use
     in the 2007 Travel Plan that are still physically open to motorized use on the
     ground.

75.  More specifically, there are 641.1 miles of motorized routes that are legally
     closed on paper by the 2007 Travel Plan decision, yet they are physically
     open to illegal motorized use on the ground:

//

//

//

//

|  | 2007 Travel Plan Decision with additional post-decision discovery of illegal motorized routes included | Miles physically closed | Miles closed on paper, but physically open to illegal motorized use |
|---|---|---|---|
| Motorized routes to be closed to public seasonally with gates | 425 miles | 182.9 miles (gated) | 242.1 miles |
| Motorized routes to be closed to public year-round with gates, berms, or decommissioning | 676 miles | 277 miles (gated or bermed) | 399 miles |

76.     As indicated in the table above, the biological assessment further notes that

since the 2007 Little Belts Travel Plan was issued, additional miles of

illegal motorized routes have been discovered.  The Travel Plan biological

assessment does not disclose how many miles of additional motorized

routes have been discovered.  However, the table below demonstrates the

Forest Service has discovered 209 additional miles of illegal motorized

routes since the 2007 Travel Plan Decision was issued:

//


//

|  | 2007 Travel Plan Decision | 2021 updated inventory | Difference |
|---|---|---|---|
| Motorized routes to be closed to public seasonally with gates | 425 miles | 425 miles | 0 miles |
| Motorized routes to be closed to public year-round with gates, berms, or decommissioning | 467 miles | 676 miles | 209 miles |

77. Moreover, in Plaintiffs' comments and objection, they informed the Forest Service that they recently sent a FOIA request to the Forest Service for records of road closure violations between mid-2014 and mid-2019. In response, the Forest Service disclosed over 50 reported road closure violations in the Little Belts in that 5-year time-frame. Significantly, this data only includes the witnessed and reported violations. It is fair to assume that there are many more violations that regularly occur and are not witnessed and reported.

78. The Forest Service has apparently made no effort to request this available information from its own law enforcement officers, much less incorporate this available information into the Project analysis of open road density, habitat effectiveness, or cumulative effects.

79. The Forest Service's response to Plaintiffs' administrative objection to the Project states: "At this writing, the big game report does not address illegal road use, and the Forest recognizes the need to consider known effective closures and recalculate elk habitat effectiveness."

80. After this concession, the Forest Service prepared a document dated August 28, 2020, entitled "Addendum to Big Game Report."

81. The post-Objection August 28, 2020 addendum to the big game report recalculates habitat effectiveness and open road density for the Project.

82. However, the post-Objection August 28, 2020 addendum to the big game report refuses to include non-system, i.e. illegal, motorized routes in either the open road density or the habitat effectiveness calculations.

83. Nonetheless, there is a post-Objection spreadsheet in the project file, dated August 27, 2020, which discloses 2.9 miles of open non-system (illegal) road in Management Area A, 3.8 miles of open non-system (illegal) road in Management Area B, and 3.1 miles of open non-system (illegal) road in Management Area C.

84. The following table discloses current open road density and habitat effectiveness when the non-system (illegal) open motorized routes are included in the calculations:

| MA | Square Miles | System Open | Illegal Open | Total Open | Open Road Density | Habitat Effectiveness |
|---|---|---|---|---|---|---|
| A | 10.8 | 18.1 | 6.4 | 24.5 | 2.27 | Less than 50% |
| B | 12.4 | 19.9 | 3.8 | 23.7 | 1.91 | Less than 50% |
| C | 8.8 | 13.1 | 6.3 | 19.4 | 2.20 | Less than 50% |

85. During the Project, temporary road construction will add 13 miles to MA A, 21.2 miles to MA B, and 6.2 miles to MA C.

86. After the Project, there will be a permanent net increase of 0.2 miles in MA A, and 0.5 miles in MA B.

87. The following table discloses open road density and habitat effectiveness before, during, and after the Project including non-system (illegal) open motorized routes:

| MA | Current | During | Post-Project |
|---|---|---|---|
| A | ORD: 2.27<br>***<br>HE: Less than 50% | ORD: 3.47<br>***<br>HE: Less than 50% | ORD: 2.29<br>***<br>HE: Less than 50% |
| B | ORD: 1.91<br>***<br>HE: Less than 50% | ORD: 3.62<br>***<br>HE: Less than 50% | ORD: 1.95<br>***<br>HE: Less than 50% |
| C | ORD: 2.20<br>***<br>HE: Less than 50% | ORD: 2.91<br>***<br>HE: Less than 50% | ORD: 2.20<br>***<br>HE: Less than 50% |

88. As set forth in the table above, all three mapped management areas in the Project area will have less than 50% habitat effectiveness before, during, and after the Project.

89. Additionally, in the June 2019 grizzly report in the project file, the Forest Service discloses that the action area as a whole has an average open motorized route density of 3.2 miles/square mile, which will increase to at least 3.7 during the Project. These calculations were not disclosed to the public in the Project EA.

90. In the Project Biological Assessment, the Forest Service also discloses that 87% of the Project area has an open motorized route density over 1.6 miles/square mile, which means that 87% of the Project area already has less than 50% habitat effectiveness. These calculations were not disclosed to the public in the Project EA.

91. The map below is from the project file. The Project area is outlined in red. The brown and tan areas have open road density greater than 1.6 miles/square mile:



92. The Forest Service's response to Plaintiffs' administrative objection to the Project states: "Regarding road closures in the Little Belt Travel Plan, motorized traffic was prohibited yearlong on selected routes. No specific closure device was prescribed."

93. However, the Little Belt Travel Plan biological assessment discloses that 242.1 miles of roads still need to be closed by seasonal gates, and 399.0 miles of roads still need to be closed with permanent barricades.

94. The Forest Service's response to Plaintiffs' administrative objection to the Project states: "Illegal road use is short-term and addressed as soon as it is identified []."

95. However, the the Little Belt Travel Plan biological assessment discloses that there are 432.1 miles of roads that were closed on paper by the Travel Plan 14 years ago but they have not yet been not physically closed to motorized use on the ground. In addition, in the 14 years since the Travel Plan was issued, the Forest Service has discovered an additional 209 miles of open illegal routes that have not yet been physically closed.

**D. Open road density**

96. For Management Area C, the Forest Plan standard mandates: "Achieve low public access through permitting motorized use on all arterial and most collector roads. . . . Low access is defined as 0.5 to 1.5 miles of open road per square mile of area. . . . Elk habitat effectiveness will be maintained."

97. Forest-wide Management Standard C-1 (6) requires: "Manage motorized use on National Forest system lands through the Forest Travel Plan, in cooperation with the public, State of Montana, and other Federal agencies, to reduce effects on wildlife during periods of high stress (hunting seasons and wintering periods). Also see Chapter III and Appendix O. The Montana Fish and Game Commission Road Management Policy and the Forest Service Road Regulations are shown in Appendix G."

98. Appendix O sets forth road density requirements for each Management Area, including the standard for MA C, which as noted above, is "0.5 to 1.5 miles of open road per square mile of area . . . ."

99. As set forth above, the existing open road density for Management Area C is 2.20 miles/square mile.

100. As set forth above, the open road density during the Project in Management Area C, including temporary roads, will be 2.91 miles/square mile.

101. As set forth above, the open road density after the Project in Management Area C, will be 2.20 miles/square mile.

102. The Project EA does not disclose open road density before, during, or after Project implementation.

103. Based on the open road density calculation in the grizzly report, 3.2 miles/square mile, the standards for MA C (no more than 1.5), and MAs A and B (no more than 3.0) are all currently being violated and will increase

during the Project. For MAs A and B, the Project will result in a permanent net increase.

**D. Elk security**

104. The post-Objection August 28, 2020 addendum to the big game report states: "Recent research in the Elkhorn Mountains as described in the Big Game Report beginning at page 14 is very applicable to the Little Belt Mountains and is used to calculate elk security areas in the project area and the hunting districts that overlap the project area. See '20191119_EAU_OpenRouteBufferHuntingSeason.pdf' map of (lack of) existing security areas in project area with' associated Elk Analysis Units in the project record."

105. The big game report at page 14 states: "Most recently, DeVoe and others (2019) evaluated male and female elk security in the Elkhorn Mountains during the hunting season and found that elk selected for areas with a minimum of 23% canopy cover and at least 1.2 miles from an open road."

106. Devoe et al (2019) is an unpublished government report. The published, peer-reviewed version is Lowrey et al (2019), which was published in the Journal of Wildlife Management.

107. Lowrey et al (2019) finds: "We recommend that managers include measures of canopy cover and distance to motorized routes in definitions of elk security and encourage managers to implement seasonal or permanent

road closures in areas with forest canopy cover to provide elk security during hunting seasons. In the Elkhorn Mountains and other landscapes with similar forest characteristics and hunting pressures, we recommend managing for security with canopy cover values of 23–60% and distance from motorized routes of 1,846–3,679m based on our definitions of security and preferred security areas, respectively. Where possible, the implementation of more stringent objectives at the upper end of the canopy cover and distance to road thresholds will more strongly reflect preferred security areas. . . . Managing for these habitat security attributes on public lands may help to reduce the redistribution of elk to private lands that restrict hunting during the archery and rifle seasons."

108.    Thus, the published, peer-reviewed recommendations is that elk security areas in this region should have "canopy cover values of 23–60% and distance from motorized routes of 1,846–3,679m," which equates to 1.15 miles – 2.29 miles.  The "upper end" would be security areas of 60% canopy cover and 2.29 miles from motorized routes.

109.    The big game report at page 14-15 states: "Preliminary analyses indicate that there is very little elk security in either the Rabbit Creek or Lake Creek elk herd units; the security that is available is outside of the project boundary (see map in project record). Nevertheless, the unroaded portions

of the project area most likely provide some type of security even if not technically aligned with the recent science."

110.    The big game report at page 20 states: "Elk security is limited in the Rabbit Creek and Lake Creek elk herd units to areas outside of the project boundary as described in the Affected Environment. Nevertheless, treatments in the unroaded portions of the project area security would reduce canopy cover which in turn could make those areas less desirable for elk."

111.    The Project EA does not disclose elk security before, during, or after Project implementation.

112.    Additionally, no calculation of elk security or map of elk security is provided in the big game report.

113.    However, the map cited in the August 2020 post-Objection addendum to the big game report shows that the area has no elk security if elk security is defined using even the least protective parameters from Lowrey et al (2019), i.e. a minimum of 23% canopy cover and at least 1.2 miles from an open road, as shown below:

//



**E. Old Growth Forest**

114. The Forest Plan requires: "A minimum of 5 percent of the commercial forest land within a timber compartment should be maintained in an old growth forest condition."

115. The Forest Plan provides the following definition of old growth forest: "the following ecological definition will apply to old growth forest on the Lewis and Clark National Forest: An old growth forest will normally contain the following characteristics[:]

a. One or more coniferous species which are climax or long-lived seral dominants on the site

b. Two or more layers or age classes

c. A combined overstory-understory tree canopy closure which averages 60 percent or more

d. The dominant tree component generally exceeds 13 inches dbh, 50 feet in height, and has reached or is past full maturity with signs of decadence present and obvious

e. At least 2 snags/acre of 10 inches dbh or greater

f. Sparse understory shrub and herbaceous vegetation with logs and other down material common and well distributed through the stand"

116. The Project EA does not disclose the Forest Plan definition for old growth forest.

117. The Project EA does not apply the Forest Plan definition of old growth forest.

118. The Project EA does not disclose the amount of Forest Plan definition old growth that exists in each Timber Compartment.

119. The Project EA does not disclose the amount of Forest Plan definition old growth that will be logged by the Project.

120. The Project EA does not disclose which if any Timber Compartments have

5% or more of commercial lands in existing Forest Plan definition old growth.

121. The field surveys conducted for the Project did not apply the Forest Plan definition old growth forest.

122. The old growth analysis process document in the project file clarifies: "The way the old growth surveys were completed, individual areas meeting Green et al. old growth criteria were delineated out of each timber stand."

123. The Project vegetation report states: "Old growth was determined using the definitions found in Old-Growth Forest Types of the Northern Region (Green et al. 1992, errata corrected) rather than the older definition found within the Forest's protocol."

124. The result of applying Green et al rather than the Forest Plan definition is that field surveys conducted for the Project designated areas as old growth even if they did not meet the Forest Plan definition requirement for 60% canopy closure.

125. Because the field surveys designated areas as old growth that do not contain 60% canopy closure, the field surveys and resulting old growth estimates are not consistent with the Forest Plan old growth forest definition.

126. The Green et al old growth criteria have three minimum criteria: minimum age of large trees, minimum number of tress per acre of a certain size (called

diameter at breast height or "dbh"), and minimum basal area.

127. The table below compares the requirements of Green et al old growth definition with the Forest Plan old growth definition:

| | Green et al definition | Forest Plan definition |
|---|---|---|
| Minimum age of large trees | Required | Not required |
| Minimum number of trees per acres of a certain size | Required | Not required |
| Minimum Basal Area | Required | Not required |
| One or more seral dominants on site | Not required | Required |
| Two or more layers or age classes | Not required | Required |
| 60 percent canopy closure at minimum | Not required | Required |
| Dominant tree over 13" dbh and 50' tall | Not required | Required |
| 2 snags per acre at least 10" dbh at minimum | Not required | Required |
| Sparse understory vegetation, shrubs, logs, down material common & well-distributed | Not required | Required |

128. As demonstrated by the table above, the two old growth definitions have different requirements: a stand that meets Green et al criteria will not necessarily meet the Forest Plan definition and vice versa. Thus, the

application of the Forest Plan old growth definition would lead to a completely different old growth forest analysis for this Project.

129. The Project EA allows logging in old growth forest, but states that "[t]reatments in old growth stands will be designed and implemented through consultation with a wildlife biologist and silviculturist to fully maintain the structure and composition of old growth stands, as defined by Green et al. 1992."

**F.    Goshawk**

130. The goshawk is designated as a management indicator species in the Forest Plan.

131. The Forest Plan requires the Forest Service to monitor goshawk nests with a 100% sample annually.

132. The Forest Plan requires the Forest Service to report the results of this monitoring on an annual basis.

133. The Forest Plan mandates that the "Variability Which Would Initiate Further Evaluation" is a "Decrease of 10% or more in active nesting territories."

134. The Forest Plan mandates: "Evaluation of data gathered during monitoring will be guided by the Decision Flow Diagram detailed in Figure 5.1."

135. The Forest Plan mandates: "The document resulting from the use of the

Decision Flow Diagram constitutes the evaluation report."

136. The Forest Plan mandates: "The evaluation report will be made available for public review."

137. The Project EA states: "Seven goshawk home ranges are known to be present in the project area. The proposed action would result in the retention of more than enough nesting habitat for the 7 known home ranges in the project area."

138. However, in the Project EA, the Forest Service does not disclose the available data on active nesting territories to validate its habitat-based assumption.

139. "Known territories" are not the same thing as "active nesting territories."

140. The Forest Service defines "active" as "bird or young in nest."

141. The Project EA does not disclose how many territories are "active nesting territories."

142. The goshawk report in the project file does not disclose how many territories are "active nesting territories."

143. The goshawk report indicates that the Project will log 5,138 acres of goshawk nesting habitat.

144. The goshawk report indicates that the Project will burn 2,300 acres of goshawk nesting habitat.

145.   The goshawk report indicates that the Project will log 4,458 acres of goshawk post-fledgling habitat.

146.   Although undisclosed to the public in the Project EA, the Forest Service's monitoring data establishes the following regarding nests Forest-wide:

| FOREST-WIDE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 |
| Number Active | 8 | 15 | 38 | 35 | 28 | 21 | 20 | 14 | 28 |
| Annual % Decrease | -47% | -60% | N/A | N/A | N/A | -8% | N/A | -50% | N/A |

147.   In accordance with the monitoring data in the record, there was a 47% decline in active nests on the Forest in 2018.

148.   In accordance with the monitoring data in the record, there was a 60% decline in active nests on the Forest in 2017.

149.   Furthermore, even if the data was limited to the nests in the Project area, there is still a decrease greater than 10% according to the most recent annual monitoring data comparing 2018 surveys to 2019 surveys in the Project area:

//

| Territory | 2019 | 2018 |
|---|---|---|
| **Upper Spring** | Surveyed No detection | Surveyed Active |
| **Snaggy Gulch** | Surveyed No detection | Not surveyed |
| **Sage Spring** | Surveyed No detection | Surveyed Active |
| **Newlan Creek** | Surveyed Active | Surveyed No detection |
| **Little Sheep Creek** | Surveyed No detection | Surveyed Active |
| **Abbot Gulch** | Surveyed Active | Not surveyed |
| **Charcoal Gulch** | Surveyed No detection | Surveyed No detection |
| **Active Nests Total** | **2 Active Nests** | **3 Active Nests** |
| **Annual % Decrease** | **-33%** | **N/A** |

150. In accordance with the monitoring data in the record, there was a 33% decline in active nests in the Project area in 2019.

151. The Project EA does not disclose the decline in active nests Forest-wide in 2017 or 2018.

152. The Project EA does not disclose the decline in active nests in the Project

area in 2019.

153. The Forest Service did not publish an evaluation report for the 2017, 2018, or 2019 goshawk active nesting territory declines as required by the Forest Plan.

# VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*The Forest Service's representations and/or omissions in the EA regarding road density and elk habitat violate NEPA, and the Project violates the Forest Plan, in violation of NEPA, NFMA, and the APA.*

154. All previous paragraphs are incorporated by reference.

155. The Project violates the Forest Plan requirement to maintain elk habitat effectiveness and maintain an open road density of less than 1.5 miles/square mile in Management Area C in violation of NFMA. According to the road density calculations in the Project Biological Assessment, the Project also violates the 3.0 miles/square mile limitation in Management Areas A and B. The Project EA fails to take a hard look at these standards and road density calculations in violation of NEPA.

156. The Project EA fails to take a hard look at recurring illegal road use and its impacts on road density calculations and habitat effectiveness for elk in violation on NEPA, including but not limited to the agency's failure to

disclose and discuss the recurring reports of illegal road use from the Forest Service's own LEOs, as well as the agency's failure to disclose and discuss the fact that hundreds of miles of roads closed by the Little Belts Travel Plan have not yet been physically gated or barricaded but Project analysis calculations nonetheless assume that there is no motorized use on those roads.

157. The Project EA fails to provide a cumulative effects analysis of the cumulative effects on elk from the violation of hiding cover retention standards, the violation of road density limits (including illegal roads), the violation of habitat effectiveness requirements, the failure to provide any elk security areas in the Project area, and the chronic recurring reasonably foreseeable  road closure violations, in violation of NEPA.

158. The Project EA unlawfully tiers to the Travel Plan because the Travel Plan has not been fully implemented and thus the road density, security, and habitat effectiveness calculations from the Travel Plan do not accurately represent the existing condition in this Project area, in violation of NEPA. Thus, the misleading and inaccurate analysis in the Project EA does not fully and fairly disclose the existing condition or effects of the Project to the public and does not provide an analysis that comports with basic notions of scientific integrity.

159. The Project EA fails to fully and fairly inform the public regarding basic necessary facts relevant to effects on elk, including habitat effectiveness percentages, elk security percentages, and open road density calculations, in violation of NEPA.

## SECOND CLAIM FOR RELIEF

*The Forest Service's failure to use the Forest Plan definition of old growth, and consequent failures to demonstrate compliance with Forest Plan old growth standards for retention and viability, violates NFMA, NEPA, and the APA.*

160. As discussed above, the Forest Plan sets forth a specific definition for old growth forest.

161. As discussed above, the Forest Service did not use the Forest Plan definition of old growth forest for the Project analysis.

162. Instead of using the Forest Plan definition, the Forest Service used a different definition of old growth forest – Green et al old growth.

163. As discussed above, the Green et al definition of old growth leads to a different result than the use of the Forest Plan definition of old growth.

164. The Forest Service's failure to use the Forest Plan definition of old growth renders it impossible to determine (a) whether the Project area currently complies with Forest Plan old growth retention standards, and (b) whether logging is proposed in areas that will violate the Forest Plan old growth

retention standards after Project logging.  In other words, the entire old growth analysis for the Project area is invalid until the Forest Service applies the Forest Plan old growth definition.

165.  As recently held by the Ninth Circuit, the Forest Service's failure to apply a forest plan old growth definition violates NFMA.  *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 1116-17 (9th Cir. 2018).

166.  The Forest Service's failure to take a hard look at this issue in the EA and failure to fully and fairly disclose the Forest Plan old growth definition to the public in the EA violates NEPA.

167.  As the Ninth Circuit has held time and time again, the "scope of review does not include attempting to discern which, if any, of a validly-enacted Forest Plan's requirements the agency thinks are relevant or meaningful.  If the Forest Service thinks any provision of the . . . Plan is no longer relevant, the agency should propose amendments to the . . .Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005).

## THIRD CLAIM FOR RELIEF

*The Forest Service's failure to disclose the decrease in active goshawk nesting territories to the public in the EA, and failure to comply with Forest Plan requirement to conduct an evaluation report if active nests decline by 10% in a year, violates NEPA, NFMA, and the APA.*

168. All previous paragraphs are incorporated by reference.

169. The Forest Service's failure to prepare an evaluation report in response to the annual decline of over 10% in active goshawk nesting territories Forest-wide in both 2017 and 2018, as well as the decline in Project area nesting territories in 2019, violates NFMA. The Forest Service's omission of this information in the Project EA constitutes a failure to take a hard look under NEPA.

170. The Forest Service's conclusion that sufficient habitat will be conserved for goshawk in seven territories is arbitrary and capricious and misleading in light of the fact that only two out of those seven territories are active, and the goshawk is appointed by the Forest Plan as a management indicator species meant to inform the Forest Service as to whether its habitat models and assumptions are correct or incorrect. By failing to incorporate known population data into the goshawk viability analysis, and instead relying on habitat models alone, the goshawk analysis is misleading and arbitrary in

violation of NEPA, NFMA, and the APA.

## FOURTH CLAIM FOR RELIEF

*The site-specific Forest Plan amendment violates NFMA, NEPA, APA, and the*

*2012 NFMA planning regulations.*

171. All previous paragraphs are incorporated by reference.

172. The site-specific Forest Plan amendment in this case, which will allow the Project to violate elk hiding cover requirements without any corresponding reduction in road density, is subject to the 2012 NFMA planning regulations

173. The 2012 NFMA planning regulations mandate that an amendment decision must disclose what the best available science is, how the agency determined what the best available science is, and how the best available science was applied to the decision. The amendment decision in this case fails to meet all three requirements.

174. The site-specific Forest Plan amendment does not apply the best available science.

175. If the best available science is "MDFWP and USDA Forest Service 2013, USDA Forest Service 2013," those documents recommend that the Forest Service continue to comply with its existing Forest Plan hiding cover standards, and they specifically reference the Montana Elk/Logging Study, which is Forest Plan Appendix F, and which provides the scientific rationale

for the Forest Plan hiding cover standard. The amendment and Project do not apply that science because the Project violates the existing hiding cover standards.

176. If the best available science is Lowrey et al (2019)(published article) or Devoe et al (2019)(unpublished report), the amendment and Project do not apply that science because the project file indicates that there is no elk security in the Project area under the Lowrey et al (2019) elk security definition. Additionally, Lowrey et al (2019) indicates that as hiding cover is reduced, road density must decrease to compensate for hiding cover loss. The amendment and Project do not even discuss this issue, much less comply with the science by reducing road density in the Project area. Road density will increase dramatically during this Project in all MAs. Road density after the Project will increase in two MAs and stay the same in one MA as a result of this Project.

177. The 2012 NFMA planning regulations mandate that the Forest Service must analyze whether an amendment will substantially lessen protections for a species. The Forest Service did not provide this analysis in the amendment/Project EA or decision. The amendment will substantially lessen protections for elk in this Project area for the reasons discussed above.

178. The Forest Service has failed to analyze the cumulative effects on elk from this Forest Plan amendment, the violation of road density limits, the violation of habitat effectiveness requirements, the failure to provide any elk security areas in the Project area, the roads that were promised to be closed under the 2007 Travel Plan but have not been, and the chronic recurring reasonably foreseeable road closure violations, in violation of NEPA.

179. The Forest Service's failures discussed above violate the 2012 NFMA planning regulations, NFMA, NEPA, and the APA.


## VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.  Declare that the Project and/or amendment violates the law;

B.  Either vacate the Project/amendment decision or enjoin implementation of the Project;

C.  Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under EAJA; and

D.  Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 28th Day of April, 2021.

/s/ Rebecca K. Smith
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs