IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, | CV 21–51–M–DLC |
| Plaintiffs, | |
| vs. | ORDER |
| KEITH LANNOM, Deputy Regional Forester, U.S. Forest Service Region One; U.S. FOREST SERVICE; and U.S. FISH & WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| AMERICAN FOREST RESEARCH COUNCIL, an Oregon non-profit corporation, | |
| Defendant-Intervenor. | |

Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council (collectively "Alliance") challenge the United States Forest Service's decision to approve the Horsefly Project ("Project"), Little Belts Travel Plan ("Travel Plan"), and site-specific Forest Plan Amendment ("Amendment") for the Horsefly Project on the Lewis and Clark portion of the Helena-Lewis and Clark National Forest. United States Magistrate Judge Kathleen L. has entered findings and

recommendations.  (Doc. 51.)  Judge DeSoto recommends that the Court grant summary judgment in favor of Alliance as to its National Forest Management Act ("NFMA") and National Environmental Protection Act ("NEPA") claims and grant summary judgment in favor of Federal Defendants and Defendant-Intervenor on all remaining claims.  (Doc. 51 at 55.)  Judge DeSoto further recommends that the Project be enjoined and that this matter be remanded.  (*Id.*)  Federal Defendants, Defendant-Intervenor, and Alliance all filed timely objections, (Docs. 54–56); each party is therefore entitled to de novo review of those findings to which it specifically objects.  28 U.S.C. § 636(b)(1)(C).

## FACTUAL AND PROCEDURAL BACKGROUND

The Horsefly Project area consists of 20,600 acres located in the Little Belt Mountains, approximately 12 miles north of White Sulphur Springs, Montana. AR_B2_1:3760.  Approximately 71% of the project area has been designated as wildland urban interface and approximately 5% of the project area consists of private lands.  AR_B2_1:3761.  The Project is intended to improve forest health and landscape resiliency, reduce wildfire hazards, and provide wood products to local and regional economies.  AR_B5_1:0004922.  The Project proposes the following:

| Treatment | Acres |
|---|---|
| Intermediate Harvest | 3,278 |
| Regeneration Harvest | 1,049 |
| Five-Needle Pine Release | 243 |
| Non-commercial Stand Improvement | 279 |
| Precommercial Thinning | 1,117 |
| Aspen Restoration | 50 |
| Meadow Restoration | 409 |
| Rearrangement of Fuels | 465 |
| Prescribed Burning | 3,453 |
| Planting | 43 |

AR_B5_1:0004923.  The Project also includes 40.7 miles of temporary road construction followed by obliteration, 16.8 miles of reconstruction, 32.2 miles of reconditioning, and 1.7 miles of relocating system roads.  AR_B5_1:0004923.

The Project area is located within the Helena-Lewis and Clark National Forest, which operates under the 1986 Lewis and Clark National Forest Plan ("Forest Plan").  AR_A1_0000001.  The Forest Plan "guides all natural resource management activities and establishes management standards for the Lewis and Clark National Forest."  AR_A1_0000009.  The Forest Plan includes "two levels of direction: Forest-wide management direction and specific direction for each management area."  AR_A1_0000002.  The Project includes a Forest Plan amendment to exempt the Project from two Forest Plan standards that protect elk hiding cover.  AR_B5_1:0004939

Scoping for the Project began in March 2018.  AR_B2_1:0003769.  In January 2020, the Forest Service released a preliminary environmental assessment ("EA") for the Project.  AR_B1:0003555.  In May 2020, the Forest Service released a final EA and draft decision for the Project.  AR_B2_1:0003755.  The Forest Service completed the Horsefly Vegetation Project Biological Assessment ("BA") in May 2020.  AR_C2_2:0004994.  A second BA was released on August 7, 2020.  AR_C2_5:0005044.  On August 14, 2020, the Forest Service denied all administrative objections to the project, AR_B4_8:0004214, and on August 31, 2020, the Forest Supervisor signed the final decision for the Project, AR_B5_1:0004921.  The project could take up to 20 years to implement.  AR_B4_7:0004202.

4

On March 22, 2021, Alliance sent a 60-Day Notice of Intent to Sue under the ESA's citizen suit provision.  AR_H1f_0050418.  In response, the Forest Service prepared an additional BA for Whitebark Pine.  AR_C3_4:0005103.  On April 28, 2021, Alliance filed this lawsuit.  (Doc. 1.)  Alliance filed their Second Amended Complaint on September 14, 2021, seeking judicial review of the Forest Service authorizations and/or lack thereof regarding the Project, Plan, and Amendment under the APA and/or the ESA.  (Doc. 14 ¶ 1.)  First, Alliance asserts that the Forest Service's representations and/or omissions in the EA regarding road density and elk habitat violate NEPA (Claim I).  (*Id.* at 42.)  Second, Alliance alleges that the Forest Service's failure to use the Forest Plan definition of old growth, and consequent failures to demonstrate compliance with Forest Plan old growth standards for retention and viability, violates NFMA, NEPA, and the APA (Claim II).  (*Id.* at 45.)  Third, Alliance alleges that the Forest Service's failure to disclose the decrease in active goshawk nesting territories to the public in the EA, and failure to comply with the Forest Plan requirement to conduct an evaluation report if active nests decline by 10% in a year, violates NEPA, NFMA, and the APA (Claim III).  (*Id.* at 46.)  Fourth, Alliance alleges that the site-specific Forest Plan amendment violates NFMA, NEPA, the APA, and the 2012 NFMA planning regulations (Claim IV).  (*Id.* at 47.)  Fifth, Alliance claims that the agencies'

5

conclusion that the Project is not likely to adversely affect grizzly bears is arbitrary and capricious (Claim V).  (*Id.* at 50.)

Alliance request that the Court declare that the Project and/or Amendment violates the law; vacate the Project/Amendment decision or enjoin implementation of the Project; award Alliance its costs, expenses, expert witness fees, and reasonable attorney fees; and grant Alliance any such further relief as may be just, proper, and equitable.  (*Id.* at 52.)

## LEGAL STANDARDS

### I.    NEPA

NEPA "has twin aims.  First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."  *Kern v. U.S. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotations and citations omitted).

"NEPA is a procedural statute that does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."  *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal citations and

quotation marks omitted); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (stating that NEPA "prohibits uninformed-rather than unwise-agency action").

Before undertaking any "major Federal action significantly affecting the quality of the human environment," an agency must prepare a detailed Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. In order to decide whether an EIS is necessary, an agency may first prepare an EA. 40 C.F.R. § 1508.9. An EA is a "concise public document" that must "briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS]." *Id.* "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail." Id. § 1500.1(b). If the EA concludes that the proposed action will not have a significant effect on the environment, the agency may issue a Finding of No Significant Impact and may then proceed with the action without using an EIS. *Id.* § 1508.13.

## II.    NFMA

NFMA requires forest planning of National Forests at two levels: the forest level and the individual project level. 16 U.S.C. §§ 1600–1687. At the Forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." *Id.* §

1604(a).  A Forest Plan sets broad guidelines for forest management and serves as a programmatic statement of intent to guide future site-specific decisions within a forest unit.  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998).  Forest Plans must "provide for multiple use and sustained yield of the products and services" derived from the National Forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness."  16 U.S.C. § 1604(e)(1).  At the individual project level, NFMA requires that each individual project be consistent with the governing Forest Plan.  *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 851 (9th Cir. 2013).

The Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference.  *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003).  This deference may be set aside only where an agency takes a position that is "contrary to the clear language" of the Forest Plan.  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005).

## III.   APA

The APA requires a reviewing court to set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A decision is arbitrary and capricious "if the agency

has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id.* A court may not accept an agency's post hoc rationalizations for its action. *Id.* at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

## IV.   ESA

The ESA declares a national policy of conserving endangered and threatened species. 16 U.S.C. § 1531(c). In enacting the ESA, Congress intended to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978). In doing so, Congress adopted an approach of "institutionalized caution" that affords endangered species "the highest of priorities," even over the primary missions of federal agencies. *Id.* at 185, 194. To accomplish its purpose, the ESA requires that all federal agencies "insure that any action authorized, funded, or carried out by such agency (hereinafter in this section

9

referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of such species' critical habitat.  16 U.S.C. § 1536(a)(2).

The ESA mandates that federal agencies request information from the Secretary of the Interior on the potential presence of species listed or proposed to be listed as threatened or endangered in the area of the proposed agency action.  *Id.* § 1536(c)(1).  If such species may be present in the area, the agency proposing the action must prepare a BA to identify any endangered species or threatened species that is likely to be affected by the agency's proposed action.  *Id.*  If the BA concludes that the proposed project is likely to adversely affect a listed species, the action agency must then engage in informal or formal consultation with FWS.  *Forest Guardians v. Johanns*, 450 F.3d 455, 457–58 (9th Cir. 2006).  "Informal consultation . . . includes all discussions, correspondence, etc., between the Service and the [action] agency."  50 C.F.R. § 402.02.  If "the action agency determines, with the written concurrence of the consulting agency, that a proposed action 'may affect,' but is 'not likely to adversely affect' a listed species, formal consultation is not required."  *All. for the Wild Rockies*, *v. U.S. Forest Serv.*, 2008 WL 8985475, at *6 (D. Mont. July 30, 2008) (citing 50 C.F.R. § 402.02(b)(1); *id.* § 402.12(k)(1).  If the agency concludes in the BA or through informal consultation that the action is not likely to adversely affect a listed species or critical habitat, and FWS

concurs, the consultation process ends as to that species. *See* 50 C.F.R. § 402.14(b)(1).

## V.     Summary Judgment

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

DISCUSSION

## I.     Federal Defendants and Defendant-Intervenor Objections

### A. The Goshawk (Claim III)

#### i.     NFMA and NEPA

Defendant-Intervenor objects to Judge DeSoto's finding that the Forest Service's northern goshawk monitoring violated NFMA. (Doc. 55 at 8.) Defendant-Intervenor asserts that the Forest Service's 2019 evaluation report meets the Forest Plan evaluation requirements for monitoring years 2017, 2018, and 2019. (*Id.* at 13.) Relying on "the Forest Service's raw data," Defendant-

Intervenor argues that "there was no decrease in active [goshawk] nests in the project area from 2016 through 2019, a highly relevant point that the findings simply do not address." (*Id.*)  Federal Defendants, for their part, do not object to Judge DeSoto's finding that the Forest Plan and NFMA require the Forest Service to conduct additional evaluation of goshawk nesting habitat.  (Doc. 54 at 10.)  Since the issuance of the Findings and Recommendations, Federal Defendants conducted supplemental evaluation of goshawk nesting habitat which will be discussed further below.

Both Federal Defendants and Defendant-Intervenor object to Judge DeSoto's findings and recommendation regarding Claim III which asserts that the Project violates NEPA by failing to adequately monitor goshawk nesting territories.  (Docs. 54 at 5, 55 at 17.)  Federal Defendants contend that Judge DeSoto "concluded, without any analysis, that the failure to produce a forest-wide evaluation report addressing the decline in active goshawk nests [] amounts to a NEPA violation." (Doc. 54 at 10.)  Alliance counterargues that "it is well-established law that a failure to demonstrate compliance with a Forest Plan provision is both a NFMA violation and a NEPA 'hard look' violation." (Doc. 60 at 8.)

Reviewing de novo, the Court agrees with Alliance that the Forest Service's failure to disclose and evaluate the decline in active goshawk nesting territories violated both NFMA and NEPA.

The goshawk is a management indicator species for old growth forest special habitat needs.  AR_B2_1:0003797.  The Forest Plan requires the Forest Service to monitor active nesting territories for goshawks on an annual basis with a 100% sample size annually.  AR_A1:000323.  The Forest Plan requires the Forest Service to report the results of this monitoring on an annual basis. AR_A1:0000323.  The Forest Plan further provides that a decrease of 10% or more in active nesting territories would initiate further evaluation.  AR_A1:000323.

The Goshawk Final Analysis indicates that the Project will include logging 5,138 acres of goshawk nesting habitat and burning 2,300 acres of goshawk nesting habitat.  AR_G15c_2:0042080.  The Project EA states that "[s]even goshawk home ranges are known to be present in the project area" and "the proposed action would result in the retention of more than enough nesting habitat for the [seven] known home ranges in the project area."  AR_B2_1:0003796.  The EA provides that "[i]n 1992 there were 19 known territories on the Forest whereas in 2015 that had increased to 73 territories.  Decreases in active nesting territories of 10% or more have occurred from one year to the next on several occasions, and this is explained in the [2019] monitoring report."  AR_B2_1:0003798.  However,

while the cited monitoring report is dated February 2019, it only covers years 2007 through 2016, and therefore does not provide data on years 2017, 2018, and 2019. AR_G15_c16:0042288.  According to the 2016, 2017, 2018, and 2019 Goshawk Survey Results, there was a drop in active goshawk nests from 38 nests in 2016 to eight active nests in 2019, which was not disclosed to the public.  *See* AR_42248–42258 (2018 Goshawk Survey), AR_42224–42225 (2018 Goshawk Survey), AR_42259–42260 (2019 Goshawk Survey).

In *Native Ecosystems Council v. Lannom*, 598 F. Supp. 3d 957, 975–76 (D. Mont. 2022), this Court found that the Forest Service violated both NFMA and NEPA when it failed to report "the undisputed decline in goshawk nesting territory" in the Castles Project EIS.  Here, Federal Defendants all but concede that the Forest Service's failure to disclose the decrease in active goshawk nesting territories to the public in the EA and failure to comply with the Forest Plan requirement to conduct an evaluation report if active nests decline by 10% amounts to a violation of NFMA.  (Doc. 54 at 21.)  While the Court disagrees with Alliance's uncited proposition that an NFMA violation necessarily assumes a NEPA violation, the Court nonetheless finds that the Forest Service did not meet its "obligation to consider every significant aspect of the environmental impact" nor "inform the public that it has indeed considered" concerns related to decline in goshawk nesting territory in its decision making process.  *Kern*, 284 F.3d at 1066.

14

Accordingly, Defendants' objections to Judge DeSoto's findings and recommendation as to Claim III are overruled.  Summary judgment will be entered in favor of Alliance.

### ii.      *Federal Defendants' Notice of Satisfaction*

On May 31, 2024, Federal Defendants notified the Court that the Forest Service had completed a new goshawk evaluation report that evaluates goshawk nest success from 2007 through 2020.  (Doc. 61.)  Federal Defendants claim that the new evaluation resolves the issues raised by Judge DeSoto in her Findings and Recommendations and this Court should therefore reject Judge DeSoto's determination that the Forest Service did not comply with the monitoring requirement relating to goshawk nesting territories and the requirement to conduct a further evaluation.  (*Id.* at 3–4.)

In response, Alliance argues that Federal Defendants' report does not resolve Claim III, and that Claim III can only be resolved with a new NEPA analysis.  (Doc. 62 at 2.)  Alliance contends that "the NFMA and NEPA issues are inextricably interrelated and Claim III cannot be remedied until there is a supplemental EA or EIS completed on remand."  (*Id.*)  Additionally, Alliance argues that pursuant to the Local Rules of this district, Federal Defendants must file a motion for all written requests to the Court.  (*Id.* at 4.)

Because the Court has overruled Defendants' objection to Claim III and found a NEPA violation, the Court agrees with Alliance that the Project must be remanded so that the Forest Service can cure the NEPA violation through a supplemental EA or EIS.

### iii.    *Injunctive Relief*

Next, Defendants object to Judge DeSoto's recommendation that the Project be enjoined (Docs. 55 at 26, 54 at 14.)  Defendants argue that Plaintiffs did not argue nor provide evidence in favor of injunctive relief, and the Findings and Recommendations did not undertake the requisite analysis before recommending injunctive relief and remand.  (Docs. 55 at 23, 54 at 15–20.)  In response, Alliance argues that Defendants waived their remedies arguments by not making those arguments in their summary judgment briefs.  (Doc. 60 at 10.)  In addition, Alliance contends that the normal remedy in a case involving an unlawful logging project is either a remand with an injunction, or vacatur of the underlying decision, and this case is no different.  (Doc. 60 at 10.)  The Court agrees.

In *Alliance for the Wild Rockies v. Bradford*, No. CV 09-160-M-DWM, 2010 WL 11468411 (D. Mont. Aug. 5, 2010), the Forest Service moved this Court to alter or amend its judgment that permanently enjoined three Forest Service projects based on violations of NFMA, NEPA, and the ESA.  There, the Forest Service asserted, like it does here, that "Plaintiff ha[d] not met its burden to show

an injunction is warranted as to the projects because there is no showing of
irreparable harm, nor do the balance of harms or public interest weigh in favor of
granting an injunction." *Id.* at *1.  In addressing the Forest Service's argument, the
Court explained:

> If the Forest Service were permitted to proceed with the projects,
> despite the NFMA and NEPA violations, the issue of the violations
> would become moot, and it would be both pointless and impossible to
> remedy the problems once the projects are completed. For this reason,
> it is common practice to enjoin a timber project that violates NFMA
> and NEPA.

*Id.* at *3 (citing *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957,
974 (9th Cir. 2021)).  More recently, this Court remanded and enjoined the
Castle Mountains Restoration Project after finding that the Forest Service
violated both NFMA and NEPA.  *Lannom*, 598 F. Supp. 3d at 977.  The
Court sees no reason to diverge from its prior rulings regarding remedies and
agrees that the Project should be enjoined pending compliance with NEPA.

## II.     Alliance's Objections

### A. Elk and Road Density (Claim I)

Judge DeSoto recommends granting summary judgment in favor of
Defendants on Alliance's first claim for relief regarding elk habitat and road
density. (Doc. 51 at 55.)

Alliance raises three objections to Judge DeSoto's findings on Claim I.
First, Alliance argues that based on this Court's holding in *Lannom*, the Forest

Service was required to follow the recommendations set forth in the Eastside Assessment according to Forest Plan Standard C-1(2).  (Doc. 56 at 7–12.)  Second, Alliance argues that the Project EA does not analyze the impact of temporary roads on habitat effectiveness and the Travel Plan calculations in the Big Game Report are aspirational—not actual—existing conditions.  (*Id.* at 11–13.)   Third, Alliance contends that the Forest Plan road density standard impermissibly relies on aspirational—not actual—conditions set forth in the travel plan.  (*Id.* at 13–14.) The Court will address each argument in turn.

### i.  *The Eastside Assessment and this Court's Holding in* Lannom

The Project area includes three different mapped Forest Plan Management Areas: A, B, and C.  AR_B2_1:0003961.  Approximately 28% of the Project is located within Management Area C, which has the goal of "maintain[ing] or enhance[ing] existing elk habitat by maximizing habitat effectiveness as a primary objective."  AR_A1:0000121.  Elk "[h]abitat effectiveness is defined as the percentage of available habitat that is usable by elk outside the hunting season." AR_F1_42:0010704.  Forest Plan Standard C-1(5) requires that drainages or elk herd units containing identified summer/fall elk range be maintained at 30 percent or greater effective hiding cover.  AR_A1:0000054.

Management Area C Forest Plan Management Standard C-1 provides that the Forest Service is required to "[u]tilize the general concepts presented in

18

Agriculture Handbook No. 533, Wildlife Habitats in Managed Forests."
AR_A1:0000054.  Standard C-1 goes on to explain that the plan's "specific habitat
parameters may have to be adjusted for the Lewis and Clark National Forest" and
that "[w]hen more site specific management recommendations are available
through the Forest Service or ["MTFWP"] those recommendations will be
followed."  AR_A1_00000054.

In their summary judgment brief, Alliance contended that "[t]he most recent
site specific management recommendations available through the Forest Service
and [MT FWP] for elk habitat management on this Forest are set forth in the
"Eastside Assessment."  (Doc. 26 at 11.)  The Eastside Assessment is a 2013
document that provides recommendations for elk habitat management developed
through a collaboration between biologists, researchers and leadership staff from
the Forest Service and MTFWP.  AR_F1_303:022028.  The Eastside Assessment
discusses habitat effectiveness, which it defines as "the percentage of available
habitat that is usable by elk outside the hunting season."  AR_F1_303:0022046.
The Eastside Assessment provides that "[i]n those areas where there is a desire to
improve/or maintain elk habitat use, we recommend maintaining or decreasing
road densities that correspond with the desired habitat effectiveness level per
Christensen et al. (1993)."  AR_F1_303:0022046.   However, the Eastside
Assessment goes on to explain that "[f]or simplicity, route density is used as the

19

proxy for habitat effectiveness.  In reality, elk habitat effectiveness may be

influenced by other factors than motorized routes.  Other factors should be

considered at the site-specific project level."  AR_F1_303:0022046.

      In her Findings and Recommendation, Judge DeSoto concluded that the

*Lannom* holding did not apply to the facts of this case because "the Eastside

Assessment, in *Lannom*, was in fact a site and project specific recommendation

made by the MTFWP, which the Forest Service agreed to incorporate into the

project."  (Doc. 51 at 16.)  In contrast, Judge DeSoto noted that "the Horesefly

Project AR . . . does not appear to contain such a recommendation from the

MTFWP."  (*Id.*)

      Alliance urges the Court to reject Judge DeSoto's findings and

recommendation as to Claim I, arguing that it is inconsistent with this Court's

holding in *Lannom*.  (Doc. 56 at 9.)  Alliance notes that the EA states that "[b]est

available scientific information was used to assess the project affects to wildlife

and important habitat resources" and the Project Decision references the Eastside

Assessment.  (*Id.* at 8–9.)  Therefore, according to Alliance, "the only logical

conclusion is that the Eastside Assessment must be the '[b]est available scientific

information' that the Forest Service references when it discusses Forest Plan

Standard C-1(2)."  (*Id.* at 9 (citing AR_B2_1:003865).)  Alliance further contends

that because the Eastside Assessment is part of the administrative record, it

constitutes "more site specific management recommendations" as discussed in the Forest Plan.  (*Id.*)

In response, Defendants argue that the Eastside Assessment was not incorporated into the Forest Plan, and it imposes no binding requirements on the Forest Service in relation to the Project.  (Docs. 58 at 6, 59 at 4.)  Defendant-Intervenor argues that the Eastside Assessment does not provide mandates, highlighting the document's statement that "[t]hese are recommendations only, and the group is not making decisions of setting policy for either agency in this effort." (Doc. 58 at 7.)  Defendants further contend that the Findings and Recommendations correctly distinguished the present matter from *Lannom*.  (Docs. 58 at 6, 59 at 6.)

In *Lannom*, Judge Donald W. Molloy of this Court held that the analysis of the Castle Mountains Restoration Project on the Helena-Lewis and Clark National Forest "must consider the recommendations outlined in the Eastside Assessment in addition to the Forest Plan Standards" because "the Forest Plan's plain language encompasses 'recommendations' which is exactly what the Assessment purports to be." *Lannom*, 598 F. Supp. 3d at 969.  Judge Molloy went on to explain that that the Project EIS conceded that "[t]he best available science for elk habitat management on National Forests in Montana east of the Continental Divide is the Eastside Assessment." *Id.* at 968 (internal quotation marks omitted).

Similarly, here, the Forest Service stated in the Project EA that "[b]est available scientific information was used to assess project affects to wildlife and important habitat resources."  AR_B2_1:003865.  However, in contrast with *Lannom*, nowhere in the administrative record for the Project do the agencies state that the best available science for elk habitat management in the Project Area is the Eastside Assessment.  In *Lannom*, this Court noted that "[p]lan compliance was . . . premised on incorporating site specific recommendations provided by [MTFWP], which specifically recommended implementation of the Eastside Assessment." 598 F. Supp. 3d at 969.  Here, the EA states that "[s]ite specific recommendations from MTFWP are being solicited and would be incorporated."  AR_B2_1:0003865. But, unlike in *Lannom*, there is no evidence in the Project record that MTFWP recommended implementation of the Eastside Assessment as to the Horsefly Project.

## ii.  *Impact of temporary roads on habitat effectiveness*

Next, Alliance argues that Judge DeSoto's findings and recommendation as to Claim I should be rejected because the Project EA does not analyze the impact of temporary roads on habitat effectiveness and the Travel Plan calculations in the Big Game Report are aspirational, rather than actual existing conditions.  (Doc. 56 at 11.)  Alliance cites this Court's holdings in *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060 (D. Mont. 2013) and *Native Ecosystems Council v.*

22

*Weldon*, 848 F. Supp. 2d 1207, 1219 (D. Mont. 2012) to support its argument.  As the Court will explain below, those cases are distinguishable from the present matter.

> The EA states, in pertinent part:

> *Implementation of the project would require 41.3 miles of temporary road construction* of which 28.9 miles are new and 12.4 miles are reconstruction of existing non-system routes.  All of these roads would remain closed to the public and would be obliterated upon completion of harvest activities. *There would be temporary short term effects to habitat effectiveness and security.  Design criteria are in place to provide elk with adequate undisturbed areas to which they could displace during project activities.*

AR_B2_1:0003810 (emphasis added).  In the EA, the Forest Service goes on to explain that while the Project would result in short-term displacement of elk, once the roads were decommissioned following completion of the project, use of the areas by elk should resume.  AR_B2_1:0003810.  In addition, the EA discusses studies which document the displacement effects of logging and road construction on elk, noting that in several of the studies logging activity resulted in temporary displacement, while in other studies "logging activity did not significantly alter elk home range size." AR_B2_1:0003810.  The EA further provides that the design criteria "ha[s] been shown to minimize impacts to elk during logging activities and associated road construction." AR_B2_1:0003810.  The design criteria include closing the temporary roads to the public with a physical device and using natural barriers to reinforce the

23

closure device to limit public access.  AR_B2_1:0003856. After a thorough review of the Project EA, the Court disagrees with Alliance's contention that "the Project EA contains no meaningful analysis of how temporary roads will impact elk habitat effectiveness."  (Doc. 56 at 11.)

Similarly, as shown below, the Forest Service analyzed habitat effectiveness in the Big Game Report.  AR_G15a_2:41412.  The first table sets forth habitat effectiveness as it currently exists under the 2007 Travel Plan for hunting districts 416 and 454, the districts in which the project is located, while the second table provides habitat effectiveness during project implementation for the same districts:

**Table 6.  Habitat effectiveness for Hunting Districts 416 and 454, from the *2007 Travel Plan* (source: *Little Belts Travel Plan HE* in project record).**

| Hunting District | Square Miles | Miles of Motorized Routes | Road Density | Percent Habitat Effectiveness |
|---|---|---|---|---|
| 416 | 174.1 | 205.9 | 1.18 | 57% |
| 454 | 100.2 | 138.6 | 1.38 | 54% |

AR_G15a_2:41421.

**Table 12.  Percent Habitat effectiveness during project implementation**

| Hunting District | Square Miles | Miles of Motorized Routes | Miles of Temporary Roads | 'Open' Road Density | Percent Habitat Effectiveness |
|---|---|---|---|---|---|
| 416 | 174.1 | 205.9 | 20.4 | 1.18 | 54% |
| 454 | 100.2 | 138.6 | 20.9 | 1.38 | 52% |

AR_G15a_2:41426.

The Big Game Report explains that:

> Implementation of the project would require 40.7 miles of temporary road construction of which 28.5 miles are new and 12.2 miles are reconstruction of existing non-system routes. All of these roads would remain closed to the public and would be obliterated upon completion of harvest activities. Although the use of these roads would most likely displace elk, habitat effectiveness as computed by Lyon (1983) and Leege (1984) would remain unchanged since these roads would remain closed to the public. Even if included in the calculations, the changes in open road density do not drop habitat effectiveness below 50% (Table 12). The rerouting of the Thornquist road should have little to no effect on habitat effectiveness given that the reroute is in the same general location of the existing road.

AR_G15a_2:41426.

Alliance takes issue with Judge DeSoto's finding that the Big Game Report sets out the habitat effectiveness as it currently exists under the 2007 Travel Plan for Hunting Districts 416 and 454.  (*Id.*)  Alliance contends that the Little Belt Travel Plan calculates the habitat effectiveness that will result *after* full implementation of the Travel Plan, but disregards 641.1 miles of motorized routes that are legally closed on paper but physically open on the ground.  (*Id.* at 12.)  However, as noted in the Findings and Recommendations, the miles of restricted roads that Alliance cites to applies to the entirety of the Little Belts, an area that is much larger than the Project area.  *See* AR_H1d:0050252.  Meanwhile, within Hunting Districts 416 and 454, implementation of the Travel Plan is about 95% complete.  AR_G15a_3:41453.   Further, in August 2020, the Forest Service

25

supplemented the Big Game Report with an Addendum in which it provided updated data reflecting Travel Plan implementation to date. AR_G15a_3:41448. The updated data indicated a slight increase in road density, but not enough to impact the 2020 habitat effectiveness calculations of 57% for Hunting District 416 and 54% for Hunting District 454. AR_G15a_3:41450.

In short, the analyses in the EA and Big Game Report are decidedly different from the cases cited by Alliance. Take *Kruger*, for example: there, the Forest Service argued that temporary roads did not need to be included in the analysis of the road density objectives of the Fleecer Mountain Project, contrary to both the recommendations of Christensen and the definitions contained in the Fire Effects Information System. 946 F. Supp. 2d at 1088. Accordingly, this Court found the Forest Service violated NEPA when it "entirely failed to consider an important aspect of the problem," temporary roads. *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008). Similarly, in *Weldon*, Judge Molloy highlighted that, despite adopting the recommendations from Christensen et al. (1993) and Lyon and Christensen (2002), the Forest Service "never discussed . . . what effect, if any, the temporary roads [would] have on either elk habitat or elk viability" in its consideration of implementing the Beaver Creek Landscape

Management Project.  848 F. Supp. 2d at 1219.  Judge Molloy remanded the

matter so that the Forest Service could address the issue in a supplemental

EIS.  In contrast, here, the Forest Service analyzed the impact of temporary

roads in the EA for the Horsefly Project, and therefore, the Court finds that

the agency did not act arbitrarily or capriciously.

### iii.    Road density

Next, Alliance argues that the analysis of the Forest Plan road density

standard impermissibly relies on the aspirational—not actual—conditions set forth

in the Travel Plan.  (Doc. 56 at 13.)  Alliance appears to passively challenge

through a parenthetical citation Judge DeSoto's conclusion that the Forest

Service's reliance on the data publicly revealed in a 2020 study did not violate

NEPA.[1]  (*Id.*)  According to Alliance, "[t]he problem here is that the aspirational

open road density that will ultimately be achieved by full implementation of the

Travel Plan has not yet been achieved."  (*Id.*)

For the reasons discussed above, the Court finds this argument similarly

unavailing.  As previously noted, the Travel Plan is approximately 95%

implemented in Hunting Districts 416 and 454.  AR_G15a_3:41453.  Alliance

again relies on this Court's holding in *Lannom* for the proposition that the agency

---

[1] The Court does not interpret Alliance's description of the document within a parenthetical citation as an objection and will therefore forego review of Judge DeSoto's conclusion that the document complied with NEPA.

arbitrarily and capriciously relied on assumptive rather than actual road density conditions.  (Doc. 56 at 13.)  But here, again, Alliance's reliance is misplaced.  In *Lannom*, the administrative record "indicate[d] that only approximately 40% of the decision miles [had] been implemented."  *Lannom*, 598 F. Supp. 3d at 972.  In that case, the Court highlighted the lack of clear record on existing road density and "the agency's resultant ability to take a hard look at the Project's impacts and its compliance with road density limits."  *Id.*  In contrast, here, the Forest Service relied on up-to-date data on currently existing road conditions within the Project Area.  Accordingly, the Court finds that the Forest Service took the requisite hard look at the Project's impacts, and therefore, the Court rejects Alliance's objection.

### B. Old Growth Standards (Claim II)

Alliance also objects to Judge DeSoto's findings and recommendation regarding Claim II of the Second Amended Complaint which challenges the Forest Service's Old Growth definition.  (Doc. 56 at 14.)  Alliance contends that the Forest Service attempted to change the Forest Plan's old growth definition without a Forest Plan amendment, which "flies against Ninth Circuit precedent."  (*Id.*)

Federal Defendants counter that "[t]he Forest Plan does not define 'old growth forest' or impose mandatory characteristics for old growth because a standard definition is unavailable."  (Doc. 58 at 29.)  Federal Defendants highlight that in *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 113

(9th Cir. 2018), the Ninth Circuit differentiated between "standards" which are binding limitations that require a site-specific amendment when the Forest service deviates from the standard, and guidance which is non-binding and only requires the agency to articulate a satisfactory explanation of its action. (Doc. 58 at 20.)

The Court agrees with Federal Defendants. The Forest Plan requires that "a minimum of 5 percent of commercial forest land within a timber compartment should be maintained in an old growth forest condition." AR_A1:0000068. The Forest Plan states that "a standard definition of 'old growth' is not available due to great variations in site productivity, species composition, stand history and other variables." AR_A1:0000383. The Forest Plan goes on to explain that:

> the following ecological definition will apply to all old growth forests on the Lewis and Clark National Forest: An old growth forest will normally contain the following characteristics[:]
>
> - One or more coniferous species which are climax or long-lived seral dominants on the site
>
> - Two or more layers or age classes
>
> - A combined overstory-understory tree canopy closure which averages 60 percent or more
>
> - The dominant tree component generally exceeds 13 inches dbh, 50 feet in height, and has reached or is past full maturity with signs of decadence present and obvious
>
> - At least 2 snags/acre of 10 inches dbh or greater
>
> - Sparce understory shrub and herbaceous vegetation with logs and other down material common and well distributed through the stand.

AR_A1:0000384.

The Project vegetation report provides that "[o]ld growth was determined using definitions found in Old-Growth Forest Types of the Northern Region (Green et al. 1992, errata corrected) rather than the older definition found within the Forest's protocol."  AR_G6_1:0035660.

In 1989, the Forest Service established a national "action plan to deal with management of old growth forests."  AR_F1_73:0011649.  The action plan required each region to develop local definitions of old growth. AR_F1_73:0011649.  In 1989, Region 1 created an old growth committee and set forth an action plan for meeting the national requirements; Green is a result of that action plan.  AR_F1_73:0011649.  Green provides minimum criteria for old growth within Region 1 including: a minimum average age for the largest trees; number of live trees per acre equal to or greater than a given dbh (diameter at breast height); and the minimum basal area in square feet for trees equal to or greater than five inches dbh.  AR_F1_73:0011655.

Alliance objects to Judge DeSoto's findings and recommendation that the Forest Service's use of the Green old growth definition—as opposed to the Forest Plan "definition"—complies with NFMA, NEPA, and the APA.  (Doc. 56 at 14.) Alliance cites *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th

Cir. 2002), and *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105 (9th Cir. 2018), to support its objection.  (*Id.*)  The Court finds *Idaho Sporting* and *Alliance* readily distinguishable.  First, in *Idaho Sporting*, "the Forest Service devised a new definition for old growth that [was] different from the Forest Plan definition."  305 F.3d at 970.  Similarly, in *Alliance*, the Ninth Circuit found that the Forest Service had adopted a definition of "old forest habitat" instead of using the definitions of "old forest" and "old growth" found in the relevant forest plan. 907 F.3d at 1116.  But the forest plans in *Idaho Sporting* and *Alliance* defined old growth, while the Forest Plan here states that "*a standard definition of 'old growth' is not available* due to great variations in site productivity, species composition, stand history and other variables."  AR_A1:0000383 (emphasis added).

In an attempt to illustrate its argument, Alliance contends that the Forest Plan "requires a minimum of 60% canopy closure, AR_A1:0000384, whereas the Green et al. definition has no minimum requirement for canopy closure, AR_F1_72.0011595."  (Doc. 56 at 15.)  However, as the Forest Service highlights, the Forest Plan's glossary description of old growth forest provides characteristics than an old growth forest will typically contain.  "Guidelines" are not requirements; rather, they are a "preferred or advisable course of action" to help maintain or restore resource conditions or prevent resource degradation.  *Alliance*, 907 F.3d at 1114.  Further, "the Forest Service's interpretation and implementation

31

of its own forest plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  Accordingly, reviewing de novo, the Court finds that Defendants are entitled to summary judgment on Alliance's challenge to the Old Growth Forest definition (Claim III).

### C. Forest Plan Amendment (Claim IV)

Next, Alliance objects to Judge DeSoto's finding that the Forest Service complied with NFMA, NEPA, the APA, and the 2012 planning regulations in its cumulative effects analysis for both the site-specific amendment and the Project. (Doc. 56 at 11.)  Specifically, Alliance argues that the Forest Service never explicitly identified the best available science as required by regulation and that any implicit identification must be considered in the analysis of Forest Plan Standard C-1(2).  (*Id.*)  Additionally, Alliance argues that the cumulative effects analysis must be in the Project EA.  (*Id.* at 13.)

Federal Defendants counter that the cases cited by Alliance do not support their contention that a cumulative effects analysis must be found in the Project EA and not elsewhere.  (Doc. 58 at 25.)  Federal Defendants also highlight that the cumulative effects analyses are referenced and summarized throughout the EA. (*Id.*)  Defendant-Intervenor argues that the administrative record contains the information required by the regulation and that the Amendment indeed represents the best available science.  (Doc. 59 at 10–11.)

The Forest Plan provides that "[g]enerally, the [Forest Plan] standards must be utilized . . . [h]owever, there will be some instances in which achievement of the goals and objectives is not facilitated by the standards." AR_B2_1:0003811. The Forest Plan further provides that:

> If it is determined during project design that the best way to meet the management area goals of the *Forest Plan* conflicts with a Forest Plan standard, the Forest Supervisor may approve an exception to that standard for that project; such exceptions must be described in the Finding of No Significant Impact/Decision Notice for the project, and the rationale for making the exception must be described in the project's documentation.

AR_B2_1:0003811-12.

The Project includes a site-specific amendment for two Forest Plan standards. AR_G15f_2:0049687. First, the Amendment exempts the Project from standard C-1(5) which:

> Require[s] a big game cover analysis of projects involving significant vegetation removal to ensure that effective hiding cover is maintained. The cover analysis should be done on a drainage or elk herd unit basis. Drainages or elk herd units containing identified summer range/fall range will be maintained at 30 percent or greater effective hiding cover.

AR_G15f_2:0049687. Second, the Amendment exempts the Project from Management Area C standard which requires the Forest Service to "[m]aintain effective hiding cover . . . percentages by timber compartment at an average of 40 [%] with a minimum of 35 [%]  (or the natural level if less than 35 [%]) for any individual sub-compartment." AR_G15f_2:0049687.

There are 5 timber compartments within Management Area C, 4 of which do not currently meet the 40% threshold.  AR_G15f_2:0049695.  If the Project is implemented, none of the compartments would meet the 40% threshold. AR_G15f_2:0049695.  According to the Forest Service, the "site specific Amendment should have minimal long-term effects on overall elk populations." AR_G15f_2:0049696.  Further, the Amendment "would allow only minor reductions in effective hiding cover (no more than 2%) and therefore not alter the long-term relationship between levels of multiple-use goods and services originally projected in the Forest Plan, with regard to wildlife habitat or other resources." AR_G15f_2:0049705.

Alliance argues that the Amendment fails to "explain what information was determined to be the best available scientific information, explain the basis for that determination, and explain how the information was applied to the issued considered" as required by 36 C.F.R. § 219.3.  (Doc. 56 at 16.)  Alliance contends that the administrative record as cited in the Findings and Recommendations does not articulate which scientific papers are the best available science nor explain how that determination was made.  (*Id.* at 17–18.)  Additionally, Alliance argues that under Ninth Circuit precedent, the cumulative effects analysis must be in the Project EA.  (Doc. 56 at 18.)  In response, Defendants cite to several points in the administrative record in which they claim the Forest Service satisfied its

34

requirements under 36 C.F.R. § 219.3.  (Docs. 58 at 24, 59 at 11.)  Reviewing the

arguments and administrative record de novo, the Court agrees with Defendants.

"Under the NFMA, the Forest Service may amend a Forest Plan in any

manner whatsoever but any Forest Plan amendment that would result in a

significant change in the plan requires the preparation of an EIS."  *Native*

*Ecosystems Council v. Dombeck*, 304 F.3d 886, 898 (9th Cir. 2002) (citing 16

U.S.C. § 1604(f)(4) (internal quotations omitted).  Here, the Forest Service

concluded that the Amendment was not significant because it "would allow only

minor reductions in effective hiding cover."  AR_G15f_2:0049705,

AR_B2_1:0003813.

In the Project EA, the Forest Service stated that "[b]est available scientific

information was used to assess project affects to wildlife and important habitat

resources."  AR_B2_1:0003865.  The Project EA cites to "MDFWP and USDA

Forest Service 2013, USDA Forest Service 2013"—the Eastside Assessment,

Burcham and others 1999, Proffitt et al. 2013, and Ranglack et al. 2016 in its

discussion of the Amendment.  AR_B2_1:0003812.  The Decision Notice and

Finding of No Significant Impact provides further evidence of the Forest Service's

considerations.  Under the heading "Using the Best Scientific Information to

Inform the Amendment (§219.3)" the Forest Service states:

> The amendment used current and best available scientific literature.
> This scientific literature does not support a specific, quantifiable cover

recommendation (MDFWP and USDA Forest Service 2013, USDA Forest Service 2013), thus it is not possible to predict what level of change might have an impact on elk distribution. Moreover, the effect of a reduction in hiding cover is not directly relatable to changes in elk behavior. Elk responses to changes in hiding cover may be masked or outweighed by elk responses to open road densities and hunting pressure, and other things such as weather, forage availability and learned behavior (Burcham and others 1999, Proffitt et al. 2013, Ranglack et al. 2016).

AR_B5_1:0004942.  Alliance seems to insist—without citation—that the Forest Service must choose a single piece of scientific literature to represent the "best available science" to inform an amendment under 36 CFR § 219.3. (Doc. 56 at 17 (stating that EA cites to four scientific papers but does not state which, if any, are the best available science).)  This theory does not appear to be tethered to the regulation itself nor any binding case law; as such, the Court is satisfied that the Forest Service complied with its obligations under the regulation.

Alliance again implicitly argues that the Eastside Assessment is the best available science, and that it should have been considered in the analysis of Forest Plan C-1(2), which is the subject of Claim I.  (Doc. 56 at 17.)  The Court agrees with the Findings and Recommendations that this argument is circular and not supported by the Forest Plan language or the law.  (Doc. 51 at 48.)

Turning to the cumulative effects analysis, Alliance argues that under well-established Ninth Circuit precedent, a cumulative effects analysis must be in the Project EA.  (Doc. 56 at 18.)  Defendants counter that the Forest Service properly analyzed the cumulative effects of the Project and the Amendment in the Project's specialist reports and the Site Specific Amendment Reports.  (Docs. 58 at 25, 59 at 12.)  Federal Defendants point to the EA itself which states that "[d]etailed information regarding effects, leading to specific reasoned conclusions can be found in the cumulative effects section of each specialist's report."  (Doc. 58 at 25 (citing AR_B2_1:3773).)

In reviewing the EA, the Court finds that the Forest Service adequately addressed the cumulative effects of the Project and the Amendment.  The EA itself discusses the cumulative effects of the Project and the Amendment on the wolverine, AR_B2_1:0003807, visual resources, AR_B2_1:0003814 and AR_B2_1:0003863–64, threatened and endangered species, AR_B2_1:0003867, and soil and water, AR_B2_1:0003884.  The Forest Service provided more details within the specialist reports, *see, e.g.*, AR_G1_10:0034462, AR_G15_1:0043019, and the Big Game Report, AR_G15a_2:0041427–28, referenced in the EA.  The Court rejects Alliance's request to fault the agency for supplementing its analysis of cumulative effects in the EA with more detailed specialist reports.  Reviewing

de novo, the Court and finds that the Forest Service took the requisite hard look at the Forest Plan Amendment as required by NEPA.

**D. The Grizzly Bear (Claim V)**

Finally, Alliance objects to Judge DeSoto's finding that the conclusions of the informal consultation for the Project are consistent with the BiOp for the Travel Plans. (Doc. 56 at 19–20.) Alliance contends that "the highest likelihood of incidental take of female grizzly bears over the next 15 years is in the Sheep Creek Grizzly Analysis Unit which is the very unit that encompasses the Horsefly Project." (*Id.* at 20 (internal citations omitted).) Accordingly, "the 'not likely to adversely affect' conclusion for this Project is inconsistent with the Travel Plan Biological Opinion's conclusion for the same area, and therefore the Project conclusion is arbitration and capricious." (*Id.* (internal citations committed).)

Federal Defendants accuse Alliance of misunderstanding the conclusions reached in the Horsefly and Travel Plans consultations. (Doc. 58 at 26.) As Federal Defendants explain it, "the proposed actions would have no adverse effects on grizzly bears unless female grizzly bears are present" and as Judge DeSoto explained in her findings, "the agencies 'acknowledged in both [biological opinions that] adult female grizzlies and cubs do not use the Sheep Creek [Grizzly Bear Analysis Unit] where the project is located, and there have been very few, sporadic sightings of male or subadult bears in the Travel Plans area, none of

which are close to the Little Belts or the Project area.'" (*Id.* at 27 (quoting Doc. 51 at 54.)

On de novo review, the Court agrees with Defendants.  The Forest Service concluded in the Project BA that "[b]ased on the analysis of direct, indirect, and cumulative effects of the Horsefly project on grizzly bears, the project May Affect, but is Not Likely to Adversely Affect the species."  AR_C5:0005064.  The BA explained that its conclusion was based on several findings including the that the majority of the action area is not suitable for grizzly bear occupancy and that grizzly bears do not regularly occupy the Project area. AR_C5:0005064–65.

Because the Forest Service concluded that the Project may affect grizzly bears, it requested informal consultation with FWS.  In its response to request for consultation, FWS concluded that "it is extremely unlikely that a grizzly bear would be in the action area, and even less likely to be in the smaller Project implementation area."  AR_C7:0005096.  FWS noted that the action area was outside of the grizzly bear recovery zones and that there had been no records of grizzly bears in the action area for the last 20 years.  AR_C7:0005094.  Further, FWS explained that "occurrence of a grizzly bear in the Project area would likely be by a dispersing male" because males have larger home ranges than females. AR_C7:0005094.  Accordingly, FWS stated that "while disturbance from roads and other Project activities may affect the behavioral response of dispersing males

39

and subadults, the Service does not anticipate such effects to be significant to subadult or male grizzly bears.  The likelihood of grizzly bears in the project area other than dispersing males is discountable at this time."  AR_C7:0005094.

Meanwhile, in the January 27, 2021, BA for Ongoing Travel Plans, the Forest Service concluded that "[a]s a result of the short and long term impacts to grizzly bears, implementation of the proposed action 'may affect and is likely to adversely affect' grizzly bears."  AR_H1d:0050261.  Consequently, the Forest Service sought formal consultation with FWS.

On July 9, 2021, FWS issued its Biological Opinion on the Effects of the Ongoing Travel Plans for the Big Belt Mountains, Little Belt Mountains, and Elkhorn Mountains on Grizzly Bears ("Travel Plan BiOp") following formal consultation with the Forest Service.  AR_J1:0050601.  The Travel Plan BiOp confirmed that the effects of the Travel Plans on grizzly bears are "not likely to jeopardize the continued existence of the grizzly bear."  AR_J1:0050629.  FWS explained that "[t]o date, neither grizzly bear breeding nor denning has been recorded and is not known to occur within the action area" and "all of the grizzly bear occurrences were . . . likely transient males."  AR_J1:0050608.  Accordingly, FWS concluded that "the effects of access management under the existing, baseline motorized access conditions may adversely affect grizzly bears at some

point in the future if female grizzly bears begin to use the action areas GBAUs."
AR_J1:0050625.

Having compared the conclusions of the informal consultation for the
Project with the conclusions of the BiOp for the Travel Plans, the Court finds that
the agencies determination that the Project would not adversely affect grizzly bears
is not arbitrary and capricious.  Alliance points to the Travel Plan BiOp's finding
that the existing road density may result in "incidental take of 'individual female
grizzly bears attempting to establish or maintain home ranges in roaded areas at
some point over the life of the . . . Little Belts . . . travel plans if and when female
grizzly bears occur in the action area [Grizzly Bear Analysis Units]."  (Doc. 56 at
19 (quoting AR_J1:50636).)  Alliance further highlights the Travel Plan's
conclusion that the "greatest likelihood of incidental take is in the Sheep Creek
Grizzly Unit" which is the unit that encompasses the Project Area.  (*Id.* at 20–21.)
But this possibility of incidental take is contingent on female grizzly bears being
present in the action area.  According to both the conclusions of the informal
consultation and the Travel Plan BiOp, female grizzlies and cubs do not use the
Sheep Creek Grizzly Unit.  AR_JI: 0050608; AR_C7:0005094.  As such, the Court
rejects Alliance's objection and finds that Defendants are entitled to summary
judgment as to Claim V.

## CONCLUSION

Reviewing de novo, the Court finds that Alliance is entitled to summary judgment on Claim III and Defendants are entitled to summary judgment on Claims I, II, IV, and V.

Accordingly, IT IS ORDERED that Judge DeSoto's Findings and Recommendations (Doc. 51) are ADOPTED IN FULL.

IT IS FURTHER ORDERED that summary judgment is entered in favor of Alliance as to Claim III.  The Project is REMANDED to the agency to cure the NEPA violation and the Project is ENJOINED pending the agency's compliance with NEPA.

IT IS FURTHER ORDERED that summary judgement is entered in favor of Defendants as to Claims I, II, IV, and V.

DATED this 27th day of June, 2024.

Dana L. Christensen, District Judge
United States District Court